**David William DOAN, Movant**

**v.**

**KENTUCKY BAR ASSOCIATION, Respondent.**

No. 2013–SC–000561–KB.

Supreme Court of Kentucky.

Feb. 20, 2014.

---

### OPINION AND ORDER

Movant and Applicant, David. William Doan, KBA Member No. 81814, bar roster address 46 Madonna Lane, Cold Springs, Kentucky 41076, was admitted to the Kentucky Bar in October 1986. In 1992, he moved to resign from the Kentucky Bar Association under terms of disbarment. This Court granted the motion and ordered Doan disbarred until such time as this Court entered an order reinstating his membership in the Kentucky Bar Associa-

---

56. KRS 600.010(2)(e).

tion. *See Doan v. Kentucky Bar Ass'n,* 842 S.W.2d 869, 870 (Ky.1992).

Doan has applied for reinstatement under SCR 3.510. The Character and Fitness Committee recommended approval of his application for reinstatement, but the Board of Governors recommended disapproval of his application. Doan. has now petitioned this Court to adopt the recommendation of the Character and Fitness Committee, and the Office of Bar Counsel joins this request. This Court instead adopts the recommendation of the Board of Governors.

## I. Factual Background

Doan withdrew from the Kentucky Bar Association under terms of disbarment to resolve a series of disciplinary actions involving substantial misconduct, including misrepresenting facts to a court, fabricating a document purporting to release his clients' claims, forging a judge's signature on a document purporting to vacate a conviction as part of a scheme to convince the client that an appeal had been successful, practicing law in a jurisdiction where he was not licensed, and misappropriating the funds of multiple clients.

Doan's misconduct and the resulting disciplinary charges against him-were described in greater detail by this Court as follows:

a) In litigation pending before the Pendleton Circuit Court and matters before the Pendleton District Court, Probate Division, involving his clients, John and Lola Bennett and their minor daughter, [Doan] failed to represent his clients competently and diligently in violation of SCR 3:130–1.1 and 1.3 (made applicable to him by SCR 3.130 as effective January 1, 1990), failed to keep his clients informed of the status of their suit to the extent necessary to permit them to make informed decisions as is required by SCR 3.130–1.4(a) and (b), made material misrepresentations of fact to the court, which is proscribed by SCR 3.130–3.3(a)(1), and in violation of SCR 3.130–3.3(a)(3), tendered to the court a fabricated document purporting to release his clients' claims, which document was never executed by his clients.

b) In representing a client in an appeal taken from the Pendleton District Court, *Commonwealth of Kentucky v. McNees,* 91–T–1100, [Doan] failed to perfect the appeal in violation of SCR 3.130–1.3, which requires an attorney to act with reasonable diligence in representing a client. When the appeal was dismissed, [Doan] fabricated an order bearing a facsimile of the judge's signature purporting to vacate his client's conviction of a traffic offense, and falsely represented to his client that the appeal had been successful. [Doan's] acts were in violation of SCR 3.130–8.3(b) and (c).

c) [Doan] was employed briefly in 1992 by a corporation in Cincinnati, Ohio. [Doan] falsely represented to his employer that he was seeking admission to the practice of law in Ohio, and that he was permitted to draft and notarize legal instruments for execution and recording in Ohio. [Doan] drafted and notarized such instruments in violation of SCR 3.130–5.5(a) which provides that a lawyer shall not practice law in a jurisdiction where such practice is not authorized, and of SCR 3.130–8.3(c), which proscribes conduct which involves dishonesty, fraud, deceit or misrepresentation.

d) [Doan] represented the interests of various claimants in negotiating a settlement of insurance benefits due as a result of a fatal collision on April 7, 1990, involving Samual Teegarden, deceased, and Charles R. Teegarden, Jr. Several checks were issued by the insurance car-

rier to [Doan] and his clients. [Doan] negotiated the checks without his clients' knowledge or consent and misappropriated the funds to his own use. [Doan's] conduct violated SCR 3.130–8.3(b) which provides that it is professional misconduct for a lawyer to commit a criminal act which reflects adversely upon his honesty, trustworthiness or fitness as a lawyer in other respects, and SCR 3.130–8.3(c) which prohibits conduct involving dishonesty, fraud, deceit or misrepresentation. [Doan] has made restitution to the Teegardens in the amount of $18,000.

e) [Doan] represented David D. Rice in negotiations for settlement of an insurance claim in 1990. [Doan] received the settlement proceeds and negotiated the check without his client's signature, knowledge or consent. [Doan] gave his client a check for $28,050 drawn on his escrow account in payment of the client's portion of the settlement. The check was dishonored by the drawee bank, and a post-dated replacement check dated February 2, 1991 was likewise dishonored. When the client requested a complete accounting of the insurance settlement and a copy of his file, [Doan] failed to comply. [Doan] acknowledges that his conduct is in violation of SCR 3.130–1.15(a), (b) and (c).

f) [Doan] represented Ella Mae Herron individually and as executrix of the estate of her husband in the settlement of claims arising from his death in a traffic accident which occurred in 1986. [Doan] received a check in partial settlement of the claims made payable to him and his client. [Doan] negotiated the check without his client's knowledge or consent and misappropriated the funds to his own use. [Doan] acknowledges that his conduct was in violation of DR 1–102(A)(3), (4) and (6) of the Code of Professional Responsibility (made applicable to him by SCR 3.130 as effective until December 31, 1989). DR 1–102(A)(3), (4) and (6) prohibit dishonesty, fraud, deceit, and misrepresentation by a lawyer, and makes it professional misconduct by a lawyer to engage in illegal conduct involving moral turpitude or other conduct which reflects adversely upon his fitness to practice. [Doan] further acknowledges that his failure to treat his client's funds appropriately is in violation of DR 9–102(A) and (B) which require prompt notice of receipt to the client and prohibit commingling of client funds with those of an attorney.

*Doan,* 842 S.W.2d at 869–70.

Doan admits this conduct would result in his permanent disbarment today. At the time, however, disbarment was not necessarily permanent, and a disbarred lawyer was eligible to seek reinstatement after a period of five years. *See* SCR 3.520 (1998). In essence, disbarment operated as a period of suspension, after which the lawyer could seek reinstatement. Now, disbarment is permanent, though suspension for a definite time is also available as a sanction. *See* SCR 3.380. Because disbarments ordered before 1998 were not, and could not be, ordered to be permanent, this Court has allowed lawyers subjected to such orders to seek reinstatement after five years. *See, e.g., Hubbard v. Kentucky Bar Ass'n,* 66 S.W.3d 684, 689 (Ky.2001). In fact, Doan's disciplinary order specifically anticipated that he would be able to apply for reinstatement after five years but stated that he could only be reinstated by this Court's order. Before 1998, disbarment reinstatements were processed under SCR 3.520,[1] which has since

---

1. Under SCR 3.520, the reinstatement application was referred to the Character and Fit-

been deleted from the rules. Such reinstatement applications are now processed under SCR 3.510, with the disbarment being treated as a five-year suspension.[2] *See Kentucky Bar Ass'n v. Wake*, 36 S.W.3d 760 (Ky.2001).

The process under SCR 3.510 is similar to that under SCR 3.520, at least with respect to suspensions for more than five years. Under SCR 3.510, if "the period of suspension has prevailed for more than five ... years," the lawyer is required to file an application for reinstatement, which is then referred to the Character and Fitness Committee. SCR 3.510(4). The Committee is to investigate the lawyer's fitness to practice law and make a recommendation concerning reinstatement. *Id.;* SCR 2.300. The Committee's recommendation is then reviewed by the Board of Governors. SCR 3.510(4). If the Committee and Board agree to recommend rein-

statement, then the application is referred to the Board of Bar Examiners, which administers a shortened version of the bar examination under SCR 3.500(3). "If the Applicant successfully completes the examination, the Court may, at its discretion, enter an order reinstating the suspended member to the practice of law. However, if the Applicant fails to pass the examination, the Court shall enter an order denying the application." SCR 3.510(4).

When Doan filed his application for reinstatement, the Character and Fitness Committee recommended approval of the application (with several conditions, including passage of the examination required by SCR 3.510(4) and 3.500(3)), but the Board of Governors recommended disapproval of the application. Because those two bodies did not concur, Doan has not yet taken the examination required by SCR 3.510(4) and 3.500(3).[3]

ness Committee and the Inquiry Commission, both of which were to make a recommendation whether to approve the application. Those recommendations were then reviewed by the Board of Governors. If the Board recommended reinstatement, then the applicant took a limited bar examination, with the results reported to this Court, which would then act on the application. If the Board recommended against reinstatement, the applicant could file a petition with the Court within 20 days. If "the Court approve[d] reinstatement over the adverse recommendation of the Board," then the applicant still had to pass the limited bar examination.

2. Doan's disbarment order stated that "[a]ny application for reinstatement filed ... shall be governed by SCR 3.520, 'Reinstatement in Cases of Disbarment' or any subsequent amendment to SCR 3.520." *Doan v. Kentucky Bar Ass'n*, 842 S.W.2d 869, 870–71 (Ky. 1992).

3. Technically speaking, the rules appear to allow review by this Court only "[i]f the Committee and the Board recommend approval of the application." SCR 3.510(4). "If they agree, then the applicant takes a shortened version of the bar examination," and "[i]f the

Applicant successfully completes the examination, the Court may ... enter an order reinstating the suspended member to the practice of law." *Id.* The rule does not prescribe what happens when the Committee and Board disagree, or where they recommend against reinstatement, and the applicant, as a result, cannot take the prescribed examination. The absence of any prescribed process could suggest that the applicant can proceed only if the Committee and Board agree to recommend reinstatement. That, however, would make a split or negative recommendation unreviewable by this Court.

And historically, a negative recommendation by the Board was reviewable. The version of SCR 3.510 in effect before 1998 expressly allowed this Court to review the recommendation of the Board to disapprove the application for reinstatement. (The old rule on disbarment (SCR 3.520, now repealed) also included such a review.) It is not clear why this review mechanism was removed from SCR 3.510 in 1998. It may have been because this Court intended such recommendations to be unreviewable. But that makes little sense, as the recommendation is just that, a recommendation, which requires final action by this Court.

The substantive question before this Court, then, is that upon which the Board and Committee could not agree, namely, whether Doan's application for reinstatement should be approved. More specifically, since Doan has not yet taken the limited bar examination prescribed by SCR 3.510, the question is whether he should be conditionally reinstated depending on whether he passes the prescribed examination. In reaching a decision on this question, the Court looks at the record developed below and the recommendations of the Committee and the Board.

## II. Proceedings before the Character and Fitness Committee

In its investigation and recommendation, the Committee is required to assess whether "the applicant ... possesses the requisite character, fitness and moral qualification for re-admission to the practice of law," which must be proved by clear and convincing evidence. SCR 2.300(6). In reaching that decision, the Committee is to consider:

(a) Whether the applicant has presented clear and convincing evidence that he/she has complied with every term of the order of suspension or disbarment.

(b) Whether the applicant has presented clear and convincing evidence that his/her conduct while under suspension shows that he/she is worthy of the trust and confidence of the public.

(c) Whether the applicant has presented clear and convincing evidence

that he/she possesses sufficient professional capabilities to serve the public as a lawyer.

(d) Whether the applicant has presented clear and convincing evidence that he/she presently exhibits good moral character.

(e) Whether the applicant has presented clear and convincing evidence that he/she appreciates the wrongfulness of his/her prior misconduct, that he/she has manifest contrition for his/her prior professional misconduct, and has rehabilitated himself/herself from past derelictions.

*Id.* "Failure to meet any of these criteria may constitute a sufficient basis for denial of a petitioner's application." *Id.*

A reinstatement applicant is "held to a substantially more rigorous standard than a first time applicant for an initial admission to the Bar," and "[t]he prior determination that [the applicant] engaged in professional misconduct continues to be evidence against him." SCR 2.300(7). The applicant bears the burden of proof, SCR 2.300(6), and "the proof presented must be sufficient to overcome [the] prior adverse judgment [of disbarment]," SCR 2.300(7). In addition to the criteria listed above that must be shown by clear and convincing evidence, the Committee is to consider and weigh the following factors:

The nature of the misconduct for which the applicant was suspended or disbarred.

---

It appears instead that this mechanism was omitted by mistake in the course of an overhaul of the processing of disciplinary matters, which included removing responsibility for reinstatement matters from the Inquiry Tribunal (the precursor to the Inquiry Commission). *See* Ky. Sup. Ct. Order 98-1. But since those changes, this Court has nonetheless allowed review of negative reinstatement

recommendations, despite no express provision for such review in the rules. *See, e.g., Hubbard v. Kentucky Bar Ass'n,* 66 S.W.3d 684, 686 (Ky.2001) (reviewing case where Committee voted in favor of reinstatement and the Board voted against); *Kentucky Bar Ass'n v. Wake,* 36 S.W.3d 760 (Ky.2001) (reviewing case despite Committee and Board voting against reinstatement).

The applicant's conception of the serious nature of his or her act.

The applicant's sense of wrongdoing.

The applicant's previous and subsequent conduct and attitude toward the courts and the practice, including the element of time elapsed since disbarment.

The applicant's candor in dealing with the Character and Fitness Committee.

The relevant knowledge of witnesses called by the applicant.

*Id.*

The Committee's investigator interviewed at least 18 individuals, including Doan and lawyers and judges in the area. The investigator prepared a report summarizing his interviews and including his conclusions concerning Doan. In addition to this report (and the interviews), the Committee held a hearing at which Doan presented his own testimony and that of two others, Charles Donald Wells, a prominent attorney from the area and family friend; and Myron Lee Doan, who is the retired Dean of Students at Morehead State University and Doan's own brother. Doan's counsel, Bar Counsel, and the members of the committee examined all three witnesses during the hearing. Bar Counsel did not offer any witnesses.

After the hearing, the Committee issued its recommendation, which included a substantial discussion of the evidence and how it supported a finding that Doan has "the requisite character, fitness and moral qualification for re-admission to the practice of law," SCR 2.300(6), specifically with reference to the five "issues" listed in SCR 2.300(6).

As to whether Doan had complied with his suspension order, the Committee noted that Doan had not been practicing law for a period of time prior to his suspension on December 17, 1992. Doan had fully complied with the suspension order, paid the amounts required, and refrained from practicing law. Additionally, he had obtained the necessary CLE and paid all sums requested by the KBA. Thus, the Committee found that Doan complied with all terms of his suspension order as required by SCR 2.300(6)(a).

As to Doan's fitness to practice law and worthiness of public trust, the Committee discussed the lawyers and judges interviewed by the investigator and the witnesses at the hearing. As for the lawyers and judges interviewed, the Committed stated that "very few of them had specific knowledge pertaining to Mr. Doan's resignation," but that "many had heard rumors of alleged problems with drugs and alcohol, but had no personal knowledge of his circumstances." According to the recommendation, "most [of the interviewees] knew or had heard that Mr. Doan had mislead [sic] clients and court personnel." The interviewees "had mixed opinions" about Doan, ranging "from noncommittal on the subject of whether he should be readmitted, to opposed to readmission, to believing that Mr. Doan had earned a second chance." Some of the interviewees expressed "concerns . . . concerning [Doan's] honesty and integrity," and "a number expressed the inability to trust Mr. Doan, due to the egregious nature of his past actions and what one called a 'chronic problem with the truth.'" Affidavits and reference letters submitted on behalf of Doan were also mixed.

Despite the overall mixed opinion of the interviewees, Doan's two live witnesses testified that he is worthy of the public trust. Both testified, at length, about his extensive volunteer work with his church (which included working on food, toy, and clothing drives; fund raising for a new addition; working with a free meal program; serving as an elder and later as chair of the church's board), and his efforts

to assist the local community. Doan's own testimony echoed that of these witnesses.

Based on this, the Committee found that Doan had carried his burden to establish that he is worthy of the public trust as required under SCR 2.300(6)(b).

As to Doan's professional capabilities, the Committee noted that he had only practiced law for around five years at the time he was disbarred. Concerns were expressed, by the KBA and the Committee, about the length of time Doan had been out of the practice, the changes in the practice of law in general, and his ability to jump back in on his own. The Committee also noted that Doan had studied for and passed the MPRE and would have to pass the bar examination prior to being reinstated.

The Committee also noted that Doan testified that he would be willing to have a mentor and would report to such person and follow his or her advice. The Committee asked Doan's counsel, Deanna Dennison, if she would undertake such a mentoring role and she agreed to do so. Doan further stated that he would be willing to undertake a KYLAP evaluation and to follow KYLAP's recommendations, whatever they may be.

The Committee found that with a mentor in place and a commitment to follow the mentor's advice and utilize his or her assistance, Doan possessed sufficient professional capabilities to be reinstated to the practice of law, upon passage of the bar exam, as required by SCR 2.300(6)(c). The Committee further recommended that a mentoring relationship be a condition of reinstatement for a period of three years and that Doan be required to enter into a written mentoring agreement with the Committee. The Committee also recommended that Doan have a KYLAP evaluation as a term of his admission and agree to abide by whatever recommendations KYLAP makes.

As to whether Doan presently exhibits good moral character, the Committee noted that its investigator found no indication of any current character issues or flaws. It noted that Doan's two witnesses had testified as to his present good moral character and that the KBA presented no evidence to the contrary. Based on that proof, the Committee found that Doan had carried his burden to show that he presently exhibits good moral character, as required under SCR 2.300(6)(d).

As to Doan's contrition, remorse and rehabilitation, the Committee noted that Doan testified at length concerning his continued contrition and remorse. He pointed out specific instances where he had been embarrassed by his actions and the fact that people looked at him differently. He appeared to be sincere in his feelings and testimony. His brother, Myron Doan, also testified as to the remorse he had observed and his brother's changed ways. The investigator found that Doan is in compliance with the law and found no indication of any ongoing negative behavior. The Committee stated that no negative evidence was presented. Therefore, the Committee found that Doan has met his burden of proof and established his contrition, remorse, and rehabilitation, as required by SCR 2.300(6)(e).

Based upon its findings of fact and conclusions of law, the Committee recommended that Doan's application for reinstatement to the practice of law be approved, conditioned on the following:

1. Doan take, and pass, the Kentucky Bar Examination for reinstatement applicants.

2. Doan obtain Deanna Dennison as a mentor, and enter into and comply with a written mentoring agreement with the Committee. This mentor-

ing relationship was to be in place for a period of no less than three years, and if Dennison were to ask to be excused from the mentoring agreement, she and Doan were to notify the Committee and provide an alternate seasoned attorney willing to serve as a mentor for the remainder of the period.

3. Doan be evaluated by KYLAP and agree to comply with whatever recommendations, if any, KYLAP makes.

### III. Proceedings before the Board of Governors

The Board of Governors undertook its review of Doan's case on June 18, 2013. It examined the full record and made its own findings of fact and conclusions of law, and a recommendation to this Court. Ultimately, the Board recommended against approval of Doan's application for reinstatement. In making this determination, the Board recognized that the burden of proof is on the applicant to provide clear and convincing evidence that he possesses the requisite fitness of character and moral qualifications for readmission to the practice of law.

The Board noted that "several factors about the applicant's life, since the Order of Disbarment, are undisputed." It noted that he "has had gainful and responsible employment during this time and is presently a FedEx driver," and "that [he] has been married for 32 years and that he has been a responsible member of both his immediate family and his extended family." The Board noted that Doan's brother "provided compelling testimony of how the applicant has been an outstanding family-member over the last twenty years," and that Charles Donald Wells had "stated that [Doan] 'has continued to be a stalwart in his family and community.'" The Board

also acknowledged that Doan has "been an active and respected member of his church, including being an elder in his church." The Board also noted that Doan, "in his official interview and testimony before the Character and Fitness Committee, expressed remorse for his actions underlying his disbarment."

But the Board went on to recognize what it described as "troubling aspects to [Doan's] interview answers and testimony." The Board noted "that the charges [against Doan] included such actions, described by many in this record as egregious actions, as forging a judge's signature to orders, forging clients' signatures to checks and misappropriating client funds." The Board was concerned that Doan was not fully acknowledging or taking responsibility for his misconduct, noting that when asked about his actions by the Character–and–Fitness investigator, he "gave only vague and general answers," and "stated he only has vague recollections of his actions leading to his disbarment." The Board cited his specific answer about "his actions involving tendering a fabricated document to the Pendleton District Court," to which "he responded, 'I don't recall that. I do recall those people, but I take responsibility because it was under my control. It was my case and I am sure I did foul something up.'"

The Board also cited the following exchange, which took place when Doan was asked by the investigator about having forged a judge's signature:

> Investigator: Do you recall manufacturing Judge Wehr's signature?
>
> Doan: No, but I may well have done it. Or someone may have done it who was under my control. So—so I am not denying it.

The Board also cited the following exchange about an instance of his mishandling of client funds:

Investigator: D. Rice in negotiations for settlement of an insurance claim in 1990. Doan received the settlement proceeds and negotiated the check without his client's signature, knowledge or consent. Doan gave his client a check for $28,050, drawn on his escrow account in payment of the client's portion of the settlement. The check was dishonored by the drawee bank and a post-dated replacement check dated February 2, 1991, was likewise dishonored. When the client requested a complete accounting of the insurance settlement and a copy of his file, Doan failed to comply.

Doan: I don't remember the last part of that. I remember one of the checks not being put in the proper account and I know that happened. It was one of the girls that worked for me. There used to be a bank across the street down here. That is where it was supposed to go and it went to the other bank.

. . .

And I don't remember a second check, I mean, that may well have happened. I really don't remember that at all. I do know he was paid. I knew the money was there; so again all I can say is that was mishandled and it was under my control.

The Board also noted that Doan testified that he did not look at the Supreme Court's Opinion & Order of disbarment until two and a half years before his reinstatement hearing, and that there was evidence that Doan had taken Xanax "too much" around the time of his disbarment.

The Board noted that some people interviewed by the investigator would recommend Doan's reinstatement. They were Henry Bertram, Deanna Dennison and David Shipp. Deanna Dennison is the attorney who represented the applicant before the Character and Fitness Committee and has agreed to serve as Doan's mentor for three years should he be reinstated. Several other people interviewed—Bob List, Gregory Wehrman and David Hawkins—stated they could not make a recommendation one way or the other.

But, as the Board noted, many of the people interviewed during the investigation were not supportive or were opposed to Doan's reinstatement. For example, Jeff Dean, the Pendleton County Attorney, told the investigator that "Doan would have to come to his office, talk to him and prove to him that he had changed for him to agree to his [Doan's] reinstatement," and that "even if Doan did show up he would not trust him." The investigator described Judge Bill Wehr as having stated that "the only thing he could say about Doan's reinstatement was that he could never again trust Doan." Other people interviewed, Jack Porter and David Madden, would not recommend the applicant's reinstatement. Finally, John M. Keith, Jr., the Commonwealth's Attorney of Pendleton County now and when Doan was practicing, stated the following about whether Doan should be reinstated: "Doan obviously has a character flaw and the profession does not need him." Keith, according to the investigative report, "has no idea what Doan has done in his private life or what he has done since '92 to change his life, if anything" and "does not think . . . Doan could be trusted."

Based on its review of this evidence, the Board of Governors of the Kentucky Bar Association voted 13–3 against Doan's reinstatement. In its recommendation, the Board stated it found that because of the facts described above, Doan "has failed to meet his burden of proof, by clear and convincing evidence, that he possesses the requisite character, fitness and moral qualifications to practice law." The Board laid

out a series of concerns that led to this conclusion, stating:

There are several troubling facts which lead the Board to this finding. First, the applicant has vague recollections of the acts which led to his disbarment. To be truly contrite, remorseful and rehabilitate oneself from past wrongful acts, one first must understand what the acts were and that those acts were indeed acts that one committed. While there has been a great passage of time since these acts were committed, many of these acts were so willful and emotional, it is hard to fathom that the applicant has a vague recollection of committing the acts.

Second, there are references in the record that the acts committed by the applicant were committed in a period of time when the applicant was taking "too much" Xanax. There is little evidence in the record that the applicant has received professional help with this issue.

Third, while the applicant has taken and passed the MPRE and would be required to take and pass the Kentucky Bar Examination, there is little evidence that the applicant possesses sufficient professional capabilities, after his twenty (20) year absence from the practice of law, to practice law.

Finally, there are a number of lawyers who knew the applicant back when he was committing the acts which led to his disbarment, and know the applicant now, who would not recommend the applicant's reinstatement.

So while the Board recognizes that the applicant has worked hard to redeem himself for past misdeeds, the Board respectfully finds that the applicant has not met the high burden of proof to warrant reinstatement of his license to practice law in the Commonwealth of Kentucky.

The Board also stated, in a footnote, "that the Character and Fitness Committee must have had some reservations about granting the application when it placed the requirement of mentoring and KYLAP participation on its recommendation of reinstatement."

## IV. This Court's Review

When deciding whether a suspended or disbarred attorney should be reinstated, the primary concern is whether the person has the "requisite character, fitness and moral qualification for re-admission to the practice of law." SCR 2.300(6). And that requires consideration of whether the person has complied with the order of suspension or disbarment; has shown that he is worthy of the trust and confidence of the public; possesses sufficient professional capabilities to serve the public as a lawyer; presently exhibits good moral character; and has shown that he appreciates the wrongfulness of his prior misconduct, has manifest contrition for his prior professional misconduct, and has rehabilitated himself from past derelictions. SCR 2.300(6)(a)–(3). Perhaps more importantly, the burden of proving these things is on the applicant, who must meet a very high standard of proof, that of clear-and-convincing evidence.

There is no question that Doan has met some of the conditions for reinstatement as required by the rules and as laid out in the order disbarring him. For example, he has become CLE compliant, posted the appropriate bond to cover the costs of the proceeding, and has complied with the terms of his disbarment.

But ultimately, this Court must agree with the Board of Governors that Doan has failed to meet his burden of proof. At the reinstatement hearing, Doan offered only his own testimony and that of two witnesses, one of whom was a family friend

and lacked complete familiarity with Doan's circumstances, and one of whom was Doan's own brother. While these witnesses cannot be disregarded, neither can the likelihood of their bias, even if borne out of innocent circumstances.

Doan argues that this case is like *Hubbard v. Kentucky Bar Ass'n*, 66 S.W.3d 684, 686 (Ky.2001), in which the Character and Fitness Committee voted in favor of approving disgraced former Congressman Carroll Hubbard's reinstatement application but the Board of Governors voted against.[4] This Court allowed Hubbard's reinstatement over the Board's vote "because of the absence of the Board of Governor's presenting any proof to rebut the recommendation of the Committee." *Id.* at 696. We noted: "Once Hubbard presented sufficient proof to establish a prima facie case of good moral character, bar counsel had an implicit duty to rebut that showing with evidence of a lack of good moral character if any such evidence could be found. Bar counsel did not present any such evidence." *Id.* Because there was no countervailing evidence, "[t]he Board failed to give a reasoned and rational explanation for its rejection of the recommendation of the Character and Fitness Committee." *Id.* at 695.

Doan claims that like in *Hubbard*, the Board of Governors failed to give a reasoned and rational explanation for its rejection of the Character and Fitness Committee's recommendation in his case. This

claim, however, ignores the results of the Committee's own investigation.

The Committee itself stated in its recommendation that no negative evidence was presented that would suggest that Doan does not presently have good moral character or is worthy of the public trust. Yet the Committee's own investigator interviewed several witnesses, including sitting judges and other attorneys, who stated that Doan was untrustworthy and should not be reinstated. While many of these interviewees had limited or little knowledge of Doan in the more than 20 years since his disbarment and based their opinions on what they knew of Doan at the time of his disbarment, that does not change the fact that Doan had failed to develop a sufficient reputation in the community in the intervening time to change their minds. That Doan has failed to in any way engage with the lawyers and judges he knew while practicing and convince them of his changed ways is telling in this respect. If Doan had not convinced anyone other than a family friend and his own brother that he presently has good moral character and is worthy of the public trust, then how can this Court be convinced of that requisite character, fitness and moral qualification for re-admission to the practice of law?

We thus share the Board's concern that "a number of lawyers who knew the applicant back when he was committing the acts which led to his disbarment, and know the applicant now, who would not recommend the applicant's reinstatement."[5]

---

4. Hubbard had been "convicted of three felonies: one count of conspiracy to impede and impair the Federal Election Commission, in violation of 18 U.S.C. § 371, one count of theft of government property, in violation of 18 U.S.C. § 641, and one count of obstruction of justice in violation of 18 U.S.C. § 1503." *Hubbard v. Kentucky Bar Ass'n*, 66 S.W.3d 684, 684 (Ky.2001) (citation omitted).

5. Doan's counsel appears to have misunderstood, at least in part, this concern of the Board to mean that members of the Board had such knowledge and opinion. That is not how this Court reads the recommendation. Instead, this aspect of the Board's recommendation refers to the lawyers interviewed by the investigator, such as the Pendleton County Commonwealth's Attorney, who voiced negative opinions of Doan.

This is certainly negative evidence against Doan, and tends to show what the public might perceive if he is reinstated, which is that "the readmission is likely to cast a dark shadow over the profession." *Kentucky Bar Ass'n v. Wake*, 36 S.W.3d 760, 761 (Ky.2001). This goes to the consideration of whether the applicant has presented evidence that his "conduct while under suspension shows that he ... is worthy of the trust and confidence of the public." Doan appears to have failed in this respect.

Also troubling is the nature of Doan's misconduct, which included multiple instances of forging signatures and misappropriating client funds. While Doan disputes that the charges from 20 years ago accurately reflect what happened, the simple fact is that the contents of the disbarment order cannot be litigated at this point. And Doan himself admits that the actions described in the disbarment order would today support *permanent* disbarment. As we recently noted,

> In the past, we have consistently taken criminal financial misconduct by attorneys very seriously[.] Indeed, we have disbarred attorneys who have committed financial misconduct even when they have made efforts to rehabilitate themselves and even when they had committed merely a single offense. Permanent disbarment is the near-routine sanction for gross financial misconduct. And permanent disbarment means inability to seek reinstatement.

*Huffman v. Kentucky Bar Ass'n*, 2013–SC–000282–KB, 2013 WL 6145236, at *2 (Ky. Nov. 21, 2013) (citation footnotes and internal quotation marks omitted).

While it is not clear that Doan committed *criminal* financial misconduct (he claims, for example, that he simply deposited checks in the wrong accounts and later made good on the money), the simple fact is that he admitted to misappropriation of client funds, which is grounds for permanent disbarment. *See, e.g., King v. Kentucky Bar Ass'n*, 162 S.W.3d 462 (Ky. 2005) (granting King's motion for permanent disbarment as a result of his misappropriation of funds while serving as Master Commissioner for McCreary Circuit Court). And at least one of the attorneys interviewed, the Pendleton Commonwealth's Attorney, stated, upon reading the full description of the conduct in the disbarment order, that he would have prosecuted Doan if he had known the full extent of the misconduct.

And at the very least, Doan's combined acts of forgery and misappropriation were "gross misconduct," and "we see no reason to depart from the sound view of treating gross misconduct seriously." *Huffman*, 2013 WL 6145236, at *2. As our rules state, the disbarment order "continues to be evidence against [Doan]," and "the proof presented must be sufficient to overcome [the] prior adverse judgment [of disbarment]" if he is to be reinstated. SCR 2.300(7). We do not believe he has overcome the prior judgment. The Board properly pointed out several reasons why Doan had failed his burden.

For example, while Doan has stated he was responsible for what happened, he has not completely owned up to his misconduct and was vague on the details of what he had done, which goes to the requirement that the applicant show that he appreciates the wrongfulness of his prior misconduct, that he has manifest contrition for his prior professional misconduct, and has rehabilitated himself from past derelictions. As noted above, when pressed by the investigator or by questioning during the hearing, Doan gave vague answers about his misconduct and often suggested that someone else, albeit someone for whom he

was responsible, may have committed the acts.

More troubling than his assignment of some blame on unnamed persons was Doan's inability to recall details about the misconduct. As the Board noted, even with the lapse of time, it is unlikely that Doan remembers so little detail.

Rather, Doan's statements suggest that he has attempted to distance himself from his misconduct over the years, rather than embracing it and engaging in a project of rehabilitation and self improvement. Upon disbarment, he simply walked away. While he admirably sought psychiatric help, worked with his church, and maintained steady employment to support his family, he has offered little proof of his attempts to engage with his own past history of misconduct. He even admitted not having looked at this Court's disbarment order until just a couple of years ago. And he took no steps to return to the Bar until recent years.

Taken altogether, this suggests that Doan has had a "real reluctance to acknowledge publicly his role" in the misconduct, which we have held is. sufficient to bar reinstatement. *Kentucky Bar Ass'n v. Wake,* 36 S.W.3d 760, 761 (Ky.2001).

The Board also noted a concern that "there is little evidence that [Doan] possesses sufficient professional capabilities, after his twenty[-]year absence from the practice of law, to practice law." Such a lengthy hiatus is bound to have had an effect on Doan's professional capabilities, especially given that he had practiced only five years when he resigned. While Doan has had some law-related employment, having worked part time doing legal research in recent years, he stated in his

interview he had "forgotten everything," which was the reason he sought out part-time legal research work. Admittedly, as acknowledged by the Board, Doan has passed the Multi–State Professional Responsibility Exam and will still have to pass the bar examination required by SCR 3.510 and 3.500.[6] This would essentially make him as qualified as most newly minted law graduates, who have but a law degree and a passing score on the prescribed examinations. But unlike those graduates, Doan is "held to a substantially more rigorous standard than a first time applicant for an initial admission to the Bar." SCR 2.300(7). Perhaps the strongest fact for Doan in this regard is that he has completed more than 60 hours of continuing legal education. But this CLE is required by the rules for reinstatement, and Doan has not even put into evidence what type of education he has taken and whether it has helped bring him back up to speed to have sufficient professional capabilities to practice law.

No doubt, as the Board noted, Doan has in some ways "worked hard to redeem himself for past misdeeds." That he has made a life for himself and his family while not being able to practice law is certainly admirable. But he bears the burden of proof of his present fitness to practice law. As he himself admitted at the reinstatement hearing, his misconduct was egregious and would now support permanent disbarment. The disbarment order "continues to be evidence against him," and this Court concludes that he has failed to offer "the proof presented … sufficient to overcome that prior adverse judgment." SCR 2.300(7).

**6.** The examination is not the full two-day bar examination, but is instead "a written examination which includes the subject of professional ethics and five (5) of the subjects listed in SCR 2.080(1)." SCR 3.5100(3)(e). "A general average score of 75% or higher shall be deemed a passing score." *Id.*

Though the Character and Fitness Committee was persuaded that Doan had made the requisite showings, this Court must instead agree with the Board of Governors in this instance. Apparently the Committee (and now the Office of Bar Counsel) believe that future safeguards—the conditions to be placed on Doan's reinstatement—would be sufficient to make up for any deficiencies in his proof. But that is not enough. Once reinstated, Doan would be a full member of the bar, with all the rights and privileges enjoyed by other members. Like all other members, he is required to show fitness for those rights and privileges *before* they can be bestowed., Conditional admissions, while sometime used, are no substitute for the *ex ante* reinstatement process.

### Order

This Court, having found that it agrees with the recommendation of the Board and disagrees with the recommendation of the Character and Fitness Committee, is thus unable to reinstate David W. Doan. For that reason, the Court ORDERS that the motion for reinstatement is DENIED.

ENTERED: February 20, 2014.

/s/ John D. Minton, Jr.
    Chief Justice

All sitting. MINTON, C.J.; ABRAMSON, CUNNINGHAM, NOBLE, SCOTT and VENTERS, JJ., concur. KELLER, J., concurs in result only.